1

2

3

4

5                    **UNITED STATES DISTRICT COURT**

6                    **EASTERN DISTRICT OF CALIFORNIA**

7

8  | **E.E., a minor, by and through his guardian ad litem, LAURA HUTCHINSON-ESCOBEDO; CHRISTOPHER ESCOBEDO; and LAURA HUTCHINSON-ESCOBEDO** | **CASE NO. 1:20-CV-1291 AWI CDB**<br><br>**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT** |

9

10

11             **Plaintiffs**

12               **v.**

13  **NORRIS SCHOOL DISTRICT,**                **(Docs. 75 and 77)**

14             **Defendant**

15                         **I. Background**

16         Plaintiff E.E. is a minor who has been diagnosed with Autism Spectrum Disorder.

17  Plaintiffs Laura Hutchinson-Escobedo and Christopher Escobedo ("Parents") are E.E.'s parents.

18  Plaintiffs live in Bakersfield, CA, within the boundaries of Defendant Norris School District

19  ("NSD"). E.E. started attending kindergarten at Norris Elementary in August 2018. E.E.'s old

20  Individualized Education Plan ("Old IEP") allowed E.E. to take part in a general education

21  classroom for 98% of the time with 2% of his time spent on speech and language services. The

22  Parents agreed to the Old IEP and it was implemented starting on November 27, 2018 and

23  scheduled to end on November 27, 2019. E.E. took part in an Extended School Year ("ESY")

24  program during the summer of 2019. The parties met in March, June, and August 2019 but they

25  did not come to an agreement as to a new IEP. In the absence of an updated IEP, the Old IEP

26  continued in effect.

27         The parties met again on November 21, 2019. There was prolonged discussion and on

28  January 22, 2020, NSD offered a new Individualized Education Plan ("New IEP"). NSD sought

to move E.E. to Bimat Elementary and to place him into a special day class with a trained behavior aide for the most part, cutting down general education class time to 32%.  The Parents did not agree to the New IEP.  On January 14, 2020, the Parents filed a due process complaint against NSD.  The Parents alleged that NSD denied E.E. a free appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA").  This became the California Office of Administrative Hearings ("OAH") Case Number 2020010423.  On June 4, 2020, NSD filed its own due process complaint against the Parents.  The two cases were consolidated.  A hearing ("OAH Hearing") was held before Administrative Law Judge Adrienne Krikorian over 7 days in July 2020.

On September 2, 2020, Judge Krikorian issued her ruling ("OAH Decision"), finding in favor of the Parents in part and the NSD in part.  Judge Krikorian found that the NSD denied E.E. a FAPE between November 27, 2018 and January 22, 2020 due to inadequate implementation of the Old IEP as written.  More relevant to this case, in Issue 5, Judge Krikorian approved of the New IEP, finding that it provided a FAPE to E.E. and could be implemented over the Parents' objection.  Due to the COVID-19 pandemic, NSD sent students home for distance learning from March 18 through May 7, 2020.  In Issue 6, Judge Krikorian found NSD denied E.E. a FAPE during that distance learning period.  During the pendency of this litigation, the Old IEP remains in effect and E.E. remains a student at Norris Elementary. Doc. 50.

Plaintiffs filed suit against NSD seeking judicial review of Issue 5 of the OAH Decision, asserting violations of the Americans with Disabilities Act ("ADA"), asserting violations of Section 504 of the Rehabilitation Act ("Section 504"), and seeking attorney's fees and costs.  The operative complaint is the First Amended Complaint ("FAC"). Doc. 25.  NSD has filed a counterclaim against Plaintiffs seeking review Issue 6 of the OAH Decision. Doc. 23.  Both parties have filed motions for summary judgment. Docs. 75 and 77.

## II. Legal Standards

The IDEA provides federal funds to help state and local agencies educate children with disabilities while conditioning the funds on compliance with specific goals and procedures,

1   primarily the obligation to provide a FAPE. 20 U.S.C. § 1412.  Among the procedures mandated

2   by IDEA is the development of a written IEP for each child with a disability. 20 U.S.C. § 1401.

3   The IEP is crafted to meet the unique needs of each child with a disability by a team that includes

4   a representative of the local educational agency, the child's teacher and parents, and, when

5   appropriate, the child. 20 U.S.C. § 1414(a)(5).  Each student's IEP must be reviewed at least

6   annually. 20 U.S.C. § 1414(d)(4)(A).

7        The IDEA also contains extensive procedural safeguards for the benefit of disabled

8   children and their parents, including the opportunity to review records, the right to be notified of

9   any changes in identification, evaluation, and placement of the student, as well as the right to file a

10  due process complaint regarding their child's education. 20 U.S.C. § 1415(b)-(h).  Under the

11  IDEA, "[a]ny party aggrieved by the findings and decision made [by the hearings officer]…shall

12  have the right to bring a civil action with respect to the complaint presented…which action may be

13  brought…in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A).  In these actions, the

14  reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear

15  additional evidence at the request of a party; and (iii) basing its decision on the preponderance of

16  the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. §

17  1415(i)(2)(A).  The burden of persuasion is on the party challenging the administrative decision.

18  L.M. ex rel. Sam M. v. Capistrano Unified Sch. Dist., 538 F.3d 1261, 1269 (9th Cir. 2008).

19       Judicial review in IDEA cases "differs substantially from judicial review of other agency

20  actions, in which courts generally are confined to the administrative records and are held to a

21  highly deferential standard of review." Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471 (9th

22  Cir. 1993).  In IDEA cases, courts give "less deference than is conventional" in the review of

23  administrative decisions. Id. at 1472.  This standard was articulated in Ash v. Lake Oswego Sch.

24  Dist., 980 F.2d 585, 587-88 (9th Cir. 1992) as "The court, in recognition of the expertise of the

25  administrative agency, must consider the findings carefully…After such consideration, the court is

26  free to accept or reject the findings in part or in whole. Thus…federal courts cannot ignore the

27  administrative findings…Ultimately, however, the weight to be accorded administrative findings

28  under the IDEA is a matter within the discretion of the federal courts."  Despite this lesser

deferential standard, "[t]he amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'" Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995). After such consideration, "the court is free to accept or reject the findings in whole or in part." Gregory K v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987) (citation omitted). "When the court has before it all the evidence regarding the disputed issues, it makes a final judgment in what is not a true summary judgment procedure [but] a bench trial based on a stipulated record." Miller v. San Mateo-Foster City Unified Sch. Dist., 318 F. Supp. 2d 851, 859 (N.D. Cal. 2004) (quotation omitted).

### III. Discussion

Plaintiffs appeal Issue 5 of the OAH decision which found that "The January 22, 2020 IEP offer, developed at the November 13 and 22, 2019 and January 22, 2020 IEP team meetings, offered Student a FAPE in the least restrictive environment. Student did not meet his burden under Issues 3(a) through 3(d) that Norris failed in the January 22, 2020 IEP to offer appropriate goals, appropriate related services in the areas of communication, one-to-one aide support and a behavior plan, or occupational therapy goals and services." [AR 1341]. Plaintiffs assert that the New IEP does not meet the FAPE requirement. Doc. 75-1, 1:3-14.

NSD appeals Issue 6 of the OAH Decision which found that "Norris did not materially implement Student's November 27 2018 IEP during the 28 school days between March 23, 2020, when Norris started distance learning for all students, and May 7, 2020. Student proved that Norris materially violated the IDEA by failing to implement Student's November 27, 2018 IEP due to the COVID-19 school closure. While unavoidable circumstances prevented Norris from fully implementing Student's November 2018 IEP at school, nevertheless the IDEA includes no exceptions to implementation for physical school closures caused by pandemics or governmental directives to close schools. Norris remained responsible under the IDEA for materially implementing IEP's despite the school closure, even if by alternate methods of delivery." [AR 1348]. NSD asserts that its actions during the COVID-19 school closures sufficient and satisfied the FAPE requirement. Doc. 77, 2:22-24.

**A. Plaintiffs' Appeal**

**1. Clarity**

Plaintiffs argue "the January 22, 2020 IEP was fatally unclear, and therefore useless as a blueprint for enforcement, because it did not specify the *location* where occupational therapy services would be provided to E.E. (i.e., whether the service would be provided as a 'pull-out' service in a therapy room or as a 'push-in' service within the main classroom). Instead, the IEP cryptically stated the location of E.E.'s OT services as 'Service prov. Location,' which is an ambiguous term with no obvious meaning for a parent. [AR 1219] The IEP also failed to specify the *type* of OT services that would be provided (i.e., whether the service would be delivered individually or in a small group setting). [Id.] Finally, the IEP did not accurately state the anticipated frequency of the OT services. The District's special education director, Russellyn Sullivan, testified that E.E. was to receive weekly or twice-weekly OT sessions. [AR 2147-49] But the service and notes pages of the IEP only stated the total monthly minutes without specifying a frequency. [AR 1219, 1226]" Doc. 75-1, 13:15-14:7 (emphasis in the original).  Under the IDEA, and IEP should include "the anticipated frequency, location, and duration of those services and modifications." 20 U.S.C. § 1414(d)(1)(A)(i)(VII).  The IEP as a whole should be presented in a formal, written manner: "The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any. Furthermore, a formal, specific offer from a school district will greatly assist parents in 'presenting complaints with respect to any matter relating to the…educational placement of the child.'" Union Sch. Dist. v. Smith, 15 F.3d 1519, 1526 (9th Cir. 1994) (quoting 20 U.S.C. § 1415(b)(1)(E)).

NSD asserts that this issue "was not litigated at the due process hearing. Therefore, it was not 'exhausted' at the lower court and is inappropriately argued in this appeal." Doc. 10:7-8.  As part of their briefing, NSD acknowledges that "issues included in the due process complaint" are administratively exhausted and that "an issue is reviewable on appeal if it was actually tried by the

1   parties in the due process hearing even if not raised in the complaint." Doc. 81, 10:22-23 and 11:3-

2   4.  In their First Amended Request For Due Process Hearing (a due process hearing request is

3   known as a complaint in these administrative proceedings), Plaintiffs directly stated of the January

4   22, 2020 meeting which resulted in the New IEP that: "The District's offer of OT services was

5   unclear, because the District did not specify the location where the service would be provided (i.e.,

6   whether the service would be provided on a 'pull-out' or 'push-in' basis) or whether it would be

7   delivered on an individual or small group basis." AR 82.  That request to amend the complaint was

8   granted. [AR 89-90].  In their closing brief of the OAH Case, Plaintiffs further identified these

9   specific concerns "ambiguities that plague[]…the January 22, 2020 IEP." [AR 346-347].  This

10   issue was sufficiently raised in the administrative process.

11       Aside from this procedural argument, NSD makes no substantive response on this point.

12   The Ninth Circuit has emphatically stated:

> The IDEA contains numerous procedural safeguards that are designed to protect the rights of disabled children and their parents. These safeguards are a central feature of the IDEA process, not a mere afterthought: 'Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process as it did upon the measurement of the resulting IEP against a substantive standard.'. Because disabled children and their parents are generally not represented by counsel during the IEP process, procedural errors at that stage are particularly likely to be prejudicial and cause the loss of educational benefits.
>
> Therefore, compliance with the IDEA's procedural safeguards 'is essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important.' 'Procedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA.'

21   M.C. v. Antelope Valley Union High Sch. Dist., 858 F.3d 1189, 1195 (9th Cir. 2017) (citations

22   omitted).  Additionally, "a discussion does not amount to an offer. [the parent] could force the

23   District to provide only those services and devices listed in the IEP, not those discussed at the IEP

24   meeting but left out of the IEP document." Id. at 1199.  "A procedural violation does not

25   constitute a denial of a FAPE if the violation fails to result in a loss of educational opportunity"

26   and thus, some errors may constitute "harmless error." R.B. v. Napa Valley Unified Sch. Dist.,

27   496 F.3d 932, 942 (9th Cir. 2007) (quotations omitted).  Significantly for the case at hand,

28   "Parents must be able to use the IEP to monitor and enforce the services that their child is to

1   receive." M.C. v. Antelope Valley Union High Sch. Dist., 858 F.3d 1189, 1198 (9th Cir. 2017).

2          The language that Plaintiffs object to is comparable to that of another case in which the

3   parents argued that an IEP lacked of clarity: "the boxes are checked for both individual and group

4   services and there is no further information to describe how the 45 minutes per week would be

5   allotted to each. The IEP's only description of the services is a 'combination of individual and

6   group.'" Tamalpais Union High Sch. Dist. v. D. W., 271 F. Supp. 3d 1152, 1160 (N.D. Cal. 2017).

7   The Northern District concluded that "the terse description in the IEP of the services being offered

8   was insufficiently specific to provide notice as to exactly what Tamalpais was committing to do. It

9   therefore failed to give Parents adequate information to decide whether to accept the offer at all,

10  and it necessarily also failed to provide the required 'blueprint for enforcement'…. this procedural

11  violation deprived D.W. of a FAPE, by failing to provide any standard against which Parents

12  could measure and assure compliance with particular contractual promises made by Tamalpais in

13  the IEP." Id. at 1163.

14         The OAH Decision noted that "Although the offer [of occupational therapy] was unclear as

15  to location, that lack of clarity did not result in a material procedural violation" and that "The IEP

16  offer specified that services would be provided in the "service provider's location," which was not

17  clear on its face." [AR 1337].  The ALJ reasoned that "Although the IEP document left the

18  location of services unclear, the IEP team thoroughly discussed the offer in detail with significant

19  parental participation including numerous questions by Mother and her advocate. The procedural

20  violation of not making clear the location of services was not a material procedural violation and

21  did not deprive Parents of meaningful participation in the development of the IEP offer." [AR

22  1338].  However, the ambiguities as to the location and timing of the services would arguably not

23  allow the Parents to monitor the situation to determine if the New IEP was being implemented

24  correctly.  As the Ninth Circuit has stated "a discussion does not amount to an offer…. only those

25  services and devices listed in the IEP, not those discussed at the IEP meeting but left out of the

26  IEP document" are enforceable. M.C. v. Antelope Valley Union High Sch. Dist., 858 F.3d 1189,

27  1199 (9th Cir. 2017).  The OAH Decision did not address the issue of parental monitoring.  NSD

28  has not provided any substantive briefing to explain how the New IEP itself provided sufficient

1  information to allow for meaning monitoring.  The ambiguous language constitutes a procedural

2  error that caused a substantive violation, denying a FAPE.

3

4  **2. Pragmatic Language and Social Skills**

5       Plaintiffs argue that the New IEP failed to offer goals in pragmatic language and social

6  skills. Doc. 75-1, 21:10-11.  An IEP must include "a description of how the child's progress

7  toward meeting the annual goals described in subclause (II) will be measured and when periodic

8  reports on the progress the child is making toward meeting the annual goals (such as through the

9  use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be

10 provided." 20 U.S.C. § 1414(d)(1)(A)(i)(III).  Applicable regulations state the requirement to be

11 "(i) A statement of measurable annual goals, including academic and functional goals designed

12 to— (A) Meet the child's needs that result from the child's disability to enable the child to be

13 involved in and make progress in the general education curriculum; and (B) Meet each of the

14 child's other educational needs that result from the child's disability." 34 C.F.R. § 300.320(a)(2);

15 see also Cal. Educ. Code § 56345(a)(2) (parallel and almost identical state statutory language on

16 what must be included in an IEP).  Quoting legislative history, Plaintiffs cite to a Ninth Circuit

17 case which states "'The term "unique educational needs" [shall] be broadly construed to include

18 the handicapped child's academic, social, health, emotional, communicative, physical and

19 vocational needs.'" <u>Seattle Sch. Dist., No. 1 v. B.S.</u>, 82 F.3d 1493, 1500 (9th Cir. 1996) (quoting

20 H.R. Rep. No. 410, 1983 U.S.C.C.A.N. 2088, 2106).  "A student with a qualifying disability who

21 is performing well academically may still be IDEA eligible if he needs support in the areas of

22 emotional or behavioral development." <u>Dep't of Educ. v. Acen T.</u>, 2020 U.S. Dist. LEXIS 59676,

23 at *18 (D. Haw. Apr. 6, 2020).  But, the requirement of social-emotional intervention must first be

24 established. See <u>L.C. v. Issaquah Sch. Dist.</u>, 2019 U.S. Dist. LEXIS 77834, at *73 (W.D. Wash.

25 May 8, 2019).

26       As part of the OAH Decision, Judge Krikorian found the Old IEP wanting on this point,

27 stating that "Norris denied Student a FAPE by failing to offer appropriate goals from November

28 27, 2018, until the January 22, 2020 IEP offer. Student proved that the IEP team had acquired

sufficient information about Student at and after Student's initial IEP team meeting, to consider and develop additional goals in academics, social skills, pragmatics, executive function, occupational therapy and behavior after the November 27, 2018 IEP." [AR 1318].  This established the need for E.E.'s IEPs to contain goals that covered pragmatic language and social skills.

Regarding pragmatic language skills, NSD asserts that "pragmatics was part of the speech and language [] assessment." Doc. 81, 19:3-4.  Plaintiffs point out that the Old IEP which was deemed to fail the FAPE standard because it did not offer appropriate goals for pragmatic language contained five goals that covered communication; the service provider for this part of the IEP was the speech-language pathologist. [AR 926-28].  The New IEP contained the same 5 goals for communication with virtually identical annual goals and periodic objectives. [AR 1209-11]. The OAH Decision does not address this issue to explain how the New IEP, which contained the same goals as the Old IEP, would be sufficient.  On the point of pragmatic language goals, the New IEP also failed to meet the FAPE requirement.

For social skills, the New IEP diverged significantly from the Old IEP.  While the Old IEP had one social/emotional goal, the New IEP had six. [AR 928 and 1214-17].  Plaintiffs argue that these "were all targeting E.E.'s behaviors (such as refusals to comply and eloping from the classroom) and occupational therapy needs (such as copying words from the board and copying the upper and lowercase alphabet)….the January 22, 2020 IEP did not have any goals targeting E.E.'s known deficits in coping skills and interpersonal relationships." Doc. 75-1, 25-28.  All of the social/emotional goals do seem to cover issues of complying with teacher direction and staying on topic in class. [AR 1214-17].  In a 2018 evaluation, Stacey Limpias, the school pshychologist, opined that "In the area of Socialization, [E.E.] was rated to be within the Low range. This domain reflects his functioning and coping skills in social situations, interpersonal relationships, and play/leisure….[E.E.] does not verbally communicate with his peers often, however he has been observed playing next to and around others." [AR 920].  While testifying, Russellyn Sullivan, the administrator of student services for NSD who is the special education director, agreed that "social skills are a need for E.E." including "interpersonal relationships," "coping skills," and "play

skills" but that "it doesn't look like" any of the goals in the New IEP addressed those areas of need. [AR 2164-65].

NSD points out that "'[A]n IEP is not required to contain every goal from which a student might benefit.' R.F. by & through E.F. v. Cecil Cnty. Pub. Schs., 919 F.3d 237, 251 (4th Cir. 2019) (citation omitted); see also E. R. by E. R. v. Spring Branch Indep. Sch. Dist., 909 F.3d 754, 768 (5th Cir. 2018) (per curiam) (not requiring 'excessive goals')." Capistrano Unified Sch. Dist. v. S.W., 21 F.4th 1125, 1133 (9th Cir. 2021).  In R.F., the Fourth Circuit found:

> with respect to whether R.F.'s IEP was inadequate because it lacked a social skills goal, the ALJ found that '[R.F.] could benefit if her IEP contained a measurable socialization goal' but noted that 'an IEP is not required to contain every goal from which a student might benefit.' [] She concluded that '[t]aking the IEP as a whole,' R.F. 'was not denied a FAPE due to the lack of a social skills goal in her IEP.' [] We agree and note that the IEP did build in opportunities for R.F. to practice her social skills. For instance, R.F.'s BIP included the use of social stories to remind R.F. of appropriate social interactions, and her schedule included regular walks around the building to greet students.

R.F. v. Cecil Cty. Pub. Sch., 919 F.3d 237, 251 (4th Cir. 2019).  There does not seem to be a similar record of socialization activities in this case.  NSD has not demonstrated how development of interpersonal skills were addressed in the New IEP as a whole.  The OAH Decision does not address this issue.  Though E.E. appears to have developed his social skills (discussed below), that appears to be by happenstance rather than design.  Based on this record and argumentation, the New IEP also failed to meet the FAPE requirement on the point of social skills.

**3. Occupational Therapy**

Separate from the issue of clarity, Plaintiffs also object that the New IEP did not provide the appropriate occupational therapy for E.E.  Specifically, Dr. Kelly Auld-Wright, licensed occupational therapist, testified at the OAH hearing that E.E. should be provided two 60 minute occupational therapy sessions per week to be held one on one in a specialized therapy room plus another 30 minute consult session once a month. [AR 1818].  No one else testified on the issue of occupational therapy.  Judge Krikorian considered this evidence and instead ordered 120 minutes of occupational therapy per month plus a 20 minute consult session, reasoning that "The amount of pull-out [outside of the classroom] services recommended by Dr. Auld-Wright, when

10

considered in the context of all the other services and supports in the IEP, was excessive and restrictive for Student at the time of the offer." [AR 1337-38]. "Dr. Auld-Wright, Freeman, and Manvell recommended up to six hours, four times a week, of related services in occupational therapy, behavior intervention, and speech therapy….the bulk of that time would be provided in one-to-one instruction outside of the classroom." [AR 1334]. Judge Krikorian was especially concerned that these services "would have required Norris to pull Student out of the classroom several hours a day, causing Student to miss a substantial part of classroom time." [AR 1335]. Judge Krikorian's concerns appear to be reasonable and the conclusion was an attempt at balancing competing objectives. Neither side has provided convincing precedent to show whether this conclusion is consistent with FAPE. So, we are left just with Dr. Auld-Wright's testimony. Based on the preponderance of the evidence presented, the New IEP does not meet the FAPE standard on this point.

**4. Least Restrictive Environment**

Plaintiffs object to the New IEP in that E.E. is not placed full time in a general education class. Doc. 75-1, 29:1-2. "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). The Ninth Circuit has adopted "a four factor balancing test…(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [the student] had on the teacher and children in the regular class, and (4) the costs of mainstreaming [the student]." Sacramento City Unified Sch. Dist. v. Rachel H., 14 F.3d 1398, 1404 (9th Cir. 1994). Education must be provided "in the least restrictive environment" with a decided slant in favor of general education classes. Poolaw v. Bishop, 67 F.3d 830, 834 (9th Cir. 1995). "[T]he IDEA's strong preference for educating disabled children alongside their non-disabled peers 'is not overcome by

a showing that a special education placement may be academically superior to placement in a regular classroom.' D.R. v. Redondo Beach Unified Sch. Dist., 56 F.4th 636, 645 n.1 (9th Cir. 2022) (quoting Board of Education v. Holland, 786 F. Supp. 874, 878-79 (E.D. Cal. 1992)).  In the OAH Decision, Judge Krikorian analyzed the four Rachel H. factors and concluded that being "in a special day class with 32 percent of the day in general education, accompanied by a full time one-to-one aide, was an appropriate placement for Student in the least restrictive environment." [AR 1336].

On the issue of educational benefit of placement in general education class, the evidence presented at the OAH Hearing was mixed.  In the OAH Decision, Judge Krikorian largely based her conclusion on the testimony of Sandra McEwen, E.E.'s first grade resource support teacher, and Brandi Church, his extended school year special education teacher:

> McEwen credibly opined Student did not appear to grasp anything the classroom teacher was teaching and he did not participate. Student acquired minimal if any educational benefit from the general education classroom. Student would benefit from a class with higher student/adult ratio, which included more checks and balances of his progress. Second grade would be even more challenging. Student needed, and did better in a smaller setting with one-to-one instruction with frequent breaks.

> Church credibly opined, based upon her knowledge of Student, that the general education classroom was not an appropriate placement for Student. Student was bright and capable of accomplishing tasks with modifications. Church opined while it might be possible for Student to make some progress in general education, Student would not receive the same intensity of interventions as in special education. In contrast to special education teachers in a special day class, the general education teachers do not have the time to implement strategies, and they do not have the training to put the strategies together to make sure they are done with fidelity. Student needed a higher ratio of adults to students, which was not possible in a general education setting.

[AR 1332].  NSD argues that "E.E. has not and cannot receive any education benefit in the general education placement." Doc. 81, 21:12-13.  Both parties agree that "if the child's disabilities are so severe that he or she will receive little or no academic benefit from placement in a regular education class, then mainstreaming may not be appropriate." Bd. of Educ. v. Holland, 786 F. Supp. 874, 878 (E.D. Cal. 1992).

Plaintiffs disagree as to the testimony and assert that Ms. McEwen said she "'saw a growth in [E.E.] academically, in what he was able to do over the course of the school year....[H]e didn't

flat line.' [AR 2966-67] When asked by the ALJ whether E.E. improved academically within the general education classroom, Ms. McEwen responded: 'Yes, I think he did.' [AR 2967]." Doc. 82:16:27-17:4.  However, the testimony Plaintiffs are referring to was a discussion of the specialized services Ms. McEwen was providing to E.E. on a push in basis (in the general education classroom, but separate from the rest of the class):

THE COURT: Okay. I have a couple of questions. When you worked with a student in first grade, how often did you go into the classroom to work with student?

THE WITNESS: I worked in -- with E.E. from Monday through Thursday from 9 to 9:30.

THE COURT: All right. And were you delivering instruction during that thirty-minute period each day?

THE WITNESS: I would attempt, yes.

THE COURT: And where were you delivering the instruction?

THE WITNESS: It depended on where E.E. was in the classroom. There were times that I did it in the corner where the trains were. There were sometimes we did -- we worked at his desk. There were times that we worked under a table. There are times that we worked under a counter. There are times that we worked at another student's table. So we kind of were all over the room.

THE COURT: And when you worked at another student's table, was the other student there, as well?

THE WITNESS: No, sometimes that -- well, yes, and no. Sometimes the student was there, so we did a combined little activity, or sometimes the student wasn't there, and so I just would pull up the chair and sit next to E.E..

THE COURT: Okay. During those times, did you feel he was getting any kind of educational benefit from the

THE WITNESS: The -- hit and miss.

THE COURT: If you were to give me a percentage of the number of times he was getting an educational benefit versus the times he was not, can you do that?

….

THE WITNESS: … Okay. I would say it's, you know, as a teacher I would love to say a hundred percent of course he understood it, it was very beneficial. But in reality, it depended on what was going on with -- with E.E.. I mean, if it was a good day, a bad day, he's a – he's a human, so he had those, and sometimes that what we were doing also depict -- what was also what was going on in the classroom, if it was something that deemed a little bit better, he was more fascinated in something that was better. So percentage-wise, I would say maybe seventy percent. I saw a growth in -- academically, in what he was able to do over the course of the school

13

year. He didn't maintain -- I mean, from what he -- what he came into as a first grader, as to where he left.

THE COURT: When you say he didn't maintain as to where he left –

THE WITNESS: I mean, he didn't -- he didn't flat line.

….

THE COURT: Did he improve?

THE WITNESS: Yes, I think he did.

THE COURT: And did you ever observe him receiving academic instruction from the teacher, the Gen Ed classroom teacher?

THE WITNESS: Yes.

THE COURT: And during that time, did you observe whether or not he appeared to be responsive in obtaining any kind of educational benefit in that classroom?

THE WITNESS: It didn't appear to me as if he was grasping what was being told.

THE COURT: And why do you say that?

THE WITNESS: The -- the one example that comes to mind is that it was reading. They were on the carpet. She told him to open up the book to a certain page and read to their partner, and E.E. opened the book, but he did not turn the pages to find the correct page that she was referring to.

[AR 2964-67]. Ms. McEwen's testimony suggests that the classroom situation was similar to that of another case in which it was determined the student did not benefit from being placed in general education with an instructional aide:

> the ALJ noted Student's general education teachers testified Student could not participate in their classes, could not understand the texts, did not have the necessary vocabulary, and frequently withdrew and put her head down on her desk. Student is also 6 to 7 years behind her classmates in academic skill. Thus, while she made some minimal progress on her goals between 2014 and 2016 while in the general education setting, Student remains at kindergarten and first-grade level in terms of her cognitive abilities. The ALJ found Student was not making progress with the general education curriculum, and that any progress with her individually tailored goals (which are not at grade-level) was not the result of Student's physical presence in general education classrooms, but was tied to her constant interaction with her instructional aide, the help of two private tutors, and assistance from Mother, who is educated and involved at home.

J.S. v. Clovis Unified Sch. Dist., 2017 U.S. Dist. LEXIS 116351, at *38-39 (E.D. Cal. July 24, 2017).

Similarly, Plaintiffs argue that Ms. Church's testimony was that "E.E. was a 'bright'

student and was capable of making progress in general education." Doc. 75-1, 33:10-12.  The

exact wording of Ms. Church's testimony was not as positive regarding the efficacy of general

education:

> Q So I just have one more question. We have some testimony earlier that E.E. was able to make progress in his gen ed classroom, albeit possibly limited. Did you think -- well, first let me ask you this. Do you think gen ed is an appropriate placement for E.E.?
>
> A No.
>
> Q Okay. And is it possible that he can make progress in gen ed though?
>
> A It is possible, but you have to think about how much progress he's making and if it's -- if it's an
> appropriate amount of progress for his ability level.
>
> Q And why do you say that? What makes you think we're not meeting his ability level?
>
> A I think that with my experience with E.E. over that month and then seeing what he's capable of during this last ESY, I -- I've seen hi -- how -- how bright he is, and how he's able to accomplish the things that you set in front of him. Even though maybe you need to accommodate, you need to change and modify things for him, he really is able to meet whatever you're setting in front of him. So I think in a general education class, even though he might be making very, very limited progress, it's really doing him a disservice because he needs to have that smaller group setting with the higher ratio of adults to students so that he can really make all the progress that is possible to be made. And that cannot happen in a general education classroom.

[AR 3007-8].  A description of "very, very limited progress" would fall under the description of

"little or no academic benefit from placement in a regular education class." Bd. of Educ. v.

Holland, 786 F. Supp. 874, 878 (E.D. Cal. 1992).

Plaintiffs also point to the testimony of Dr. B.J. Freeman, an autism expert, who stated that

"the least restrictive environment for E.E. was a regular education class with supports." [AR

1565].  Her testimony was based on records, personal testing of E.E., and observation of E.E. for

less than an hour in his classroom. [A.R. 1581-82].  Her testimony on E.E.'s ability to handle the

curriculum was straightforward:

> Q Okay. Based on the constellation of scores that you got on the cognitive testing, in your opinion, does E.E. have the cognitive ability to handle grade-level curriculum?
>
> A Yes, he seems to. He's just not been given the chance with the proper

1   modifications yet.

2   [AR 1498].

3         How such a curriculum should be delivered at school seemed to be more uncertain.  Dr.

4   Freeman emphasized that there was insufficient information without a behavioral assessment for

5   determining whether a one on one aide would allow E.E. to function in a general education class:

6       Q … What I'm asking you is to tell us, in your opinion, what specific types of one
    on one or support should he have had in kindergarten? Not what the parent asked
7   for, but what he, in your opinion, should have had in kindergarten, at the
    beginning?

8

9       A Okay. He should have had a functional behavior assessment. The result of that
    assessment I think probably would have indicated he needed a one-on-one aide,
    because he was eloping from the classroom. He was at times hitting the teacher.
10  And they did move his classroom, all right? I would suspect that's what that would
    inform us, that he would need a one-to-one aide and then we -- at that point, we
11  could have taught him everything he needed to know in a -- in a regular
    kindergarten class, I believe.

12
        ….
13
        Q So you're saying that in your opinion, at the beginning of kindergarten, he
14  should have had a one-on-one aide, correct?

15      A No. That's not what I'm saying. I'm saying he should have had an assessment to
    inform us whether or not he needed an aide. I was saying my opinion doesn't
16  matter. It's what the data show. In my opinion, I think he probably was going to
    need that, hopefully for a temporary basis, but that wasn't done. That's all I'm
17  saying. But I can't say on day one of kindergarten he needed a one-to-one aide. I
    mean, we have no evidence. We have to look at the data. The data shows he was –
18
        Q Okay. So looking at the data -- looking at the data and information that was
19  available for his initial IEP where he's found eligible for special education, based
    on that data, did you think, in your opinion, at that time is when he should have had
20  one-on-one aid?

21      A At that point, he should have had a behavioral assessment, okay? And there
    should have -- there was a lot of information available about his behaviors, all
22  right? A lot of information available and from a lot of different places. I don't
    know whether he needed the one-to-one aide. There -- again, we need the
23  assessment before we make that recommendation.

24  [AR 1568-70].  Dr. Freeman further caveated her testimony by stating E.E.'s education had been

25  mishandled such that what she assumed would have worked in kindergarten (E.E. started

26  kindergarten in August 2018) would not longer suffice in 2020:

27      Q … you stated that he needs to be -- right now because of his behaviors, in a one-
    on-one situation outside of the general education classroom. Did you not just say
28  that?

1   A I said some of his teaching at this point, because he didn't get the help he needed,
2   his behavior has deteriorated, all right? He's – he's in a much worse place than he
    was when he started kindergarten…

3   ….

4   A The fact that he needs one-to-one teaching -- he needed one-to-one teaching
5   initially. It's the way it gets delivered. I think we have to deliver it may be
    somewhat more restricted now because he -- he – he's got two years where he
6   hasn't learned anything.

7   [AR 1565, 1567]. Thus, it seems that Dr. Freeman did endorse some form of non-general

8   education delivery of instruction on a temporary basis until E.E. gained the skills needed to benefit

9   from a regular class. Nevertheless, Dr. Freeman ultimately concluded: "In my opinion, E.E.

10  belongs in a general ed class. He's higher functioning. His academic skills were somewhat in the

11  average range. We do not know because he has behavioral deficits, exactly where he was

12  functioning, and he was never given the chance to function in a regular class." [AR 1573].

13       Regarding the second issue of the non-educational benefits, Judge Krikorian found:

14   Student was more social in first grade in Olsen's general education classroom than
15   in kindergarten. Student's classmates invited him to join in activities. Before
     October 2019, Student's behaviors disrupted the classroom approximately 15 to 20
16   percent of the school day. After extended school year and Student's initial
     adjustment to first grade, McEwen opined Student's disruptive behavior only
17   disrupted the classroom five percent of the time and the behavior decreased as the
     school year progressed. Extended school year teacher Church noted similar
18   characteristics by Student in the classroom in 2019 extended school year. Student's
     elopement from class and refusal behaviors gradually improved during the four-
19   week summer program and Student became more socially successful. Based upon
     his behaviors, Church credibly opined at hearing that Student would receive more
20   benefit from a special day class with less students than the larger classroom
     population of a general education classroom.

21  [AR 1333]. Plaintiffs do not seem to dispute this finding. See Doc. 75-1, 33:12-34:8. E.E. was

22  progressing, with some suggestion that the progress was in part due to being in a class with fewer

23  students.

24       For the third factor, Judge Krikorian found that

25   Student's behaviors had an impact on the classroom teacher and more indirectly on
     the other children. From the time Student entered kindergarten, the teacher and
26   adult classroom staff engaged in attempts to help Student from eloping,
     encouraging him to participate in educational activities, sometimes away from the
27   other children. The general education teachers took steps to modify the manner in
     which they delivered instruction to Student, which took them away from other
28   students. Other than a few incidents where Student reacted negatively to directives

17

by trying to hit or kick an adult staff member, no one offered any credible evidence that Student's behaviors had a significant negative impact on the other children.

[AR 1333]. Plaintiffs point out that E.E.'s disruptive behaviors decreased in first grade. Doc. 75-1, 34:13-16. E.E. may have taken up some of the classroom teacher's time, but his participation in the class was not unduly disruptive.

The parties did not present argument on the cost of mainstreaming E.E. in the OAH Hearing and the factor was not considered in the OAH Decision.

It appears that Judge Krikorian's ruling was informed by all of the testimony. In the OAH Decision, she approved of the New IEP which placed E.E. in a special day class with 32 percent of time in general education given "the amount of support Student would have required in the general education classroom, and all of the evidence indicating Student would benefit from a smaller classroom with increased adult supervision until he acquired the skills to access his education without consistent refusal behaviors." [AR 1335-36]. Ms. McEwen's and Ms. Church's testimony suggested that E.E. was receiving minimal benefit academically from the general education class. Dr. Freeman recommended a general education class but acknowledged that lessons might have to be delivered in another manner for a period of time. The non-educational benefit was attributed to being in a small class, which a special education classroom would provide but a general education classroom would not. Taken altogether, the factors point towards the least restrictive environment being a special education classroom for part of E.E.'s education. Based on the parties' briefing, the preponderance of the evidence supports Judge Krikorian's conclusion on this point.

**5. Applied Behavioral Analysis ("ABA")**

Plaintiffs argue that the New IEP should have specified that E.E. receive services from personnel trained in ABA. The OAH Decision stated "Student argued that Norris offered no evidence that the one-to-one aide would be trained in Applied Behavioral Analysis. Student's argument was not persuasive. Student cited to no authority that requires a school district to specify in an IEP the qualifications of staff assigned to work with students." [AR 1339]. NSD argues that it offered a "one-on-one SCIA, but in the SDC placement, not the general education placement" but provides no briefing on whether ABA services in particular should have been specified in the

1  New IEP. Doc. 81, 25:20-21.

2         Plaintiffs acknowledge that "the IDEA does not necessarily mandate the inclusion of a

3  particular instructional methodology in all IEPs." Doc. 75-1, 40:15-17.  The Ninth Circuit has

4  mentioned in passing that in some circumstances "school districts should specify a teaching

5  methodology for some students." J. L. v. Mercer Island Sch. Dist., 592 F.3d 938, 952 (9th Cir.

6  2010).  In one Second Circuit case, the evidence showed "a consensus that the student needs an

7  ABA program" in that "almost all of the reports found that [student] needed continued ABA

8  therapy. The fact that some reports did not mention a specific teaching methodology does not

9  negate the clear consensus that [student] required ABA support. R.E. v. N.Y.C. Dep't of Educ.,

10  694 F.3d 167, 193-94 (2d Cir. 2012).  The Second Circuit then found that an IEP with "no

11  guarantee of ABA therapy" was not sufficient. Id. at 194.  In a recent case, "the primary dispute at

12  the center of this action is whether the IEP team was required to include the Orton-Gillingham

13  methodology, or a similar program, in [student's] IEP" or whether it was acceptable for "the

14  underlying components [to be] included in the IEP, but that the IEP team was not obligated to

15  name a specific methodology." Rogich v. Clark Cty. Sch. Dist., 2021 U.S. Dist. LEXIS 197135, at

16  *16 (D. Nev. Oct. 12, 2021).  The District of Nevada concluded the student did not "necessarily

17  require[] the Orton-Gillingham methodology, but she did require an equivalent methodology that

18  was a) research-based, b) systemic, c) cumulative, and d) rigorously implemented" and that

19  "Failing to identify a methodology that would ensure that the same approach is consistently

20  utilized throughout the day by all of [student's] instructors necessarily means that [student] will

21  not have the opportunity to learn as she needs to." Id. at *23-24.  Taken altogether, this case law

22  establishes the need to specify a specific methodology when the record shows a consensus on the

23  issue.

24         In this case, the need for using ABA services is well documented in the record.  The OAH

25  Decision itself noted that NSD's IEP team discussed with the Parents "the need for a one-to-one

26  aide trained in Applied Behavioral Analysis" and that "Each of Student's [four] independent

27  assessors were confident the results of a functional behavioral assessment, as part of Student's

28  initial assessments, was warranted and would have led to development of a behavior intervention

1   plan and IEP team consideration of a one-to-one aide trained in Applied Behavioral Analysis in

2   kindergarten." [AR 1299 and 1303-4.  Even more explicitly, Josh Stuart, the school psychologist

3   that NSD itself hired to evaluate E.E., "testified at hearing, concurring with Limpias and Dr.

4   Freeman, that Student required daily and explicit instruction and systematic teaching using

5   Applied Behavioral Analysis from an appropriately trained aide to acquire appropriate behavior

6   skills." [AR 1320].  Taken altogether, there was a consensus that ABA be used in providing

7   services to E.E.  To meet the FAPE standard, E.E.'s IEP needed to specify that personnel be

8   trained in the use of ABA.

9        Taken altogether, Issue 5 of the OAH Decision is reversed.

10

11  **B. NSD's Appeal**

12       In Issue 6 of the OAH Decision, Judge Krikorian found that NSD failed to implement the

13  Old IEP in the early part of the Covid-19 pandemic when schools were closed, noting that NSD

14  did not provide sufficient virtual instruction:

15       Between March 18 and May 7, 2020, Norris provided Student with no direct
16       instruction. McEwen did not deliver to Student any virtual instruction as an
         alternative to one-to-one specialized academic instruction from McEwen, in part
17       because of Student's aversion to virtual learning. Owen also did not offer or
         provide any direct instruction. Zielsdorf also did not offer or provide Student direct
18       virtual speech therapy as an alternative. For example, Norris could have
         collaborated with Parents to find ways to provide direct instruction to Student, with
19       McEwen and or Zielsdorf participating virtually with Father's assistance, even if
         Student resisted direct participation using a computer. No one from Norris
20       discussed those types of options with Parents before May 7, 2020, or the possibility
         of offering Father training to help him deliver the speech therapy materials to
21       Student, with Zielsdorf's virtual assistance.

22       ….

23       Norris also should have held an IEP meeting, virtually if not in person….Here,
         scheduling an IEP team meeting was appropriate to allow the entire IEP team to
24       consider with Parents alternate methods of delivery of Student's services,
         particularly because Parents were struggling to deliver all of the instructional
25       materials provided by Norris to Student. Norris' failure to hold an IEP team
         meeting, in combination with its failure to send specific prior written notice to
26       Parents, significantly impeded Parents' opportunity to participate in the decision-
         making process regarding Student's alternate educational program during the
27       school closures.

28  [AR 1348-50].

                                           20

1  In this motion, NSD argues that

2  Norris temporarily halted in-person instruction due to State health orders that they
   had to comply with, or risk losing state funding and proceed with an illegal
3  educational program. The change to the educational programming was across the
   board to both general and special education students. While in-person classes are
4  the best possible option, the State is not required to make the best possible option
   available. Moreover, COVID-19 caused a deadly health concern, the best option
5  was the safe, healthy option of remaining in distance learning. Indeed, if students
   are ill or preoccupied with their safety and health, they will be too distracted to
6  focus and receive educational instruction. Instead of maintaining dangerous in-
   person instruction, Norris chose to protect their students and offer a safe
7  alternative. Norris should not now be punished for putting student's – special
   education or not – health and safety first.
8

9  Doc. 77, 11:3-13.  NSD's further argument was prefaced with multiple headings stating "…IDEA

10  Did Not Require Norris to Ignore the Stay at Home Orders." See Doc. 77, 11:15, 13:5-6, and

11  13:23-24.

12  Judge Krikorian's ruling did not say that NSD had to provide in person instruction.

13  Rather, she found that NSD did not provide E.E. sufficient virtual instruction and services.

14  Instead, NSD tried to provide "IEP services such as speech or occupational therapy" through

15  "resources and or practice exercises for the child to work on at home." [AR 1345].  Subsequent

16  cases have supported the conclusion that during the Covid-19 pandemic, IEPs had to be modified

17  but school were still responsible for providing "virtual or in-person instruction led by a teacher"

18  and that "using work packets instead" was not sufficient. Charles H. v. District of Columbia, 2021

19  U.S. Dist. LEXIS 132383, at *18 (D.D.C. June 16, 2021).  In another pandemic related case, the

20  Northern District of Georgia found that "only scheduling a student for half of the instruction

21  required by his IEP" was a failure to implement the IEP. T.H. v. Dekalb Cty. Sch. Dist., 564 F.

22  Supp. 3d 1349, 1359 (N.D. Ga. 2021).

23  The OAH Decision on Issue 6 is affirmed.

24

25

26

27

28

21

1

## IV. Order

Plaintiffs' motion is GRANTED.  The OAH Decision on Issue 5 is REVERSED.  The New IEP does not offer E.E. a FAPE and may not be implemented without the Parents' consent.

The NSD's motion is DENIED.  The OAH Decision on Issue 6 is AFFIRMED.

IT IS SO ORDERED.

Dated:   April 26, 2023          _____

                                              SENIOR  DISTRICT  JUDGE